IN THE COURT OF APPEALS OF TENNESSEE

EASTERN SECTION AT KNOXVILLE

FILED

August 28, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| HERBERT A. JENKINS, d/b/a | ) | BLOUNT CHANCERY |
| HERB JENKINS REALTY | ) | |
| | ) | |
| Plaintiff/Appellant | ) | NO. 03A01-9704-CH-00139 |
| | ) | |
| v. | ) | |
| | ) | HON. CHESTER S. RAINWATER, JR. |
| ROY W. GODDARD and wife, | ) | CHANCELLOR |
| FRANCES H. GODDARD, | ) | |
| | ) | |
| Defendants/Appellees | ) | |
| | ) | AFFIRMED |

L. Lee Kull, Maryville, for Appellant

Arthur B. Goddard and Robert N. Goddard, Maryville, for Appellees

O P I N I O N

INMAN, Senior Judge

This is an action to recover a real estate commission. The plaintiff-broker [hereafter broker] alleged that the owners of the property orally listed their property with him, that he procured a buyer who contracted to purchase the property, and because of his efforts he is entitled to a commission. The defendants alleged the contract was mutually abandoned, and that thereafter they had no contract with the broker. The Chancellor found that an alleged oral listing was not proved by the required standard of clear and cogent evidence. The broker appeals, insisting that under the preponderant facts he is entitled to a commission.

A background discussion is necessary for a perspective of this case. In early 1994, Roy W. Goddard orally listed his 45-acre tract of land with the broker, who was to receive a five percent commission if he procured a purchaser. The broker soon showed the property to Gaddis and Dietrich, all of whom met with Goddard on the property. An agreement was reached, which was reduced to writing and signed by all parties. An Agency Disclosure Statement was executed by Goddard wherein he acknowledged that the broker was his agent.

Within days, the broker received a letter from Goddard's attorney, stating that the contract was invalid[1] and that the contract should include an exchange of like-kind property under the Internal Revenue Code.  A meeting was held with all parties in attendance which was productive of no affirmative result, and the matter thereafter languished.  In July and August 1994, the broker returned the earnest money to Gaddis and Dietrich, but Gaddis remained interested in purchasing the property, which he accomplished in May 1995, about one year after the original contract was abandoned.

Gaddis testified that after Goddard returned his earnest money he considered the contract at an end and thereafter had no investment funds until July 1995 when he sold a warehouse and used the proceeds to purchase Goddard's property.

Because the broker essentially pitches his case upon the theory that the defendant and the purchaser conspired to defeat his commission, we reproduce relevant portions of the defendant's testimony:

Q:      When did you first talk to Mr. and Mrs. Gaddis about entering into a different contract?

A:      I'm not sure.  The[y] was interested, they used to take their dogs down there and run on the place, and they stayed interested in it all the time. And we decided -- it had been over a year, that it ought to be out by then.  It was supposed to have been concluded by June the 15th, they were supposed to pay me.

Q:      The contract that the Goddard firm prepared is dated May 9th, 1995. When did you first talk to the Gaddises about entering into a new contract?

A:      Well, we talked several times.  If we could get a contract we could live with, well, we would go ahead and do it.

Q:      When did you first talk to them about entering into a new contract?

A:      I'm not sure, they've been -- well, they've come down there a lot, they're good friends of ours.

Q:      Did you talk to the Goddard firm in that summer of '94?

A:      No, we waited until we thought the contract was out.

---

[1]The opinion was apparently based on the fact that Mrs. Goddard did not sign the contract.  The real estate was owned by Roy W. Goddard separately, by inheritance; in 1977, dower and curtesy estates were abolished, and Mrs. Goddard therefore had no alienable interest in the property.  Her signature was not required and its absence clearly did not vitiate the contract.  This point, however, is not crucial.

.    .    .    .    .

Q:    Did he (Gaddis) ever express to you that he was in a hurry to buy this property?

A:    No.  He just told me he wanted it some time.  He said he could wait a year or two, whatever.

Q:    Until this contract wasn't any good.

A:    Yeah.

Q:    Whose idea was it to do the new contract?

A:    Well, Gaddis said he believed we could work up one that we could live with.

Q:    Whose idea was it to do the new contract?

A:    We both talked about it, I don't know who brought it up first.  He said, "I think if we can get a new contract, we can do business."

Q:    Well, this was for your benefit, though, wasn't it?

A:    Well, his, too.  He was wanting it.

.    .    .    .    .

Q:    I take it Mr. Gaddis never told you he didn't want the property anymore.

A:    No, he never did tell me he didn't want it.


Our review of the findings of fact made by the trial court is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise, TENN. R. APP. P., RULE 13(d).

The Chancellor found that the sales contract was abandoned.  In light of the fact that the earnest money was returned by the broker at the instance of the parties, and that they, as well as the broker, obviously considered the contract to be defunct, we are unable to find that the evidence preponderates against this finding.  It then becomes necessary for the broker to prove by clear and convincing evidence that he had an oral listing agreement *after* the written contract was abandoned, *Parks v. Morris,* 914 S.W.2d 545 (Tenn. Ct. App. 1995).

The Chancellor found from all the circumstances including the crucial issue of credibility that the broker failed to prove a listing agreement by clear and convincing

3

evidence.  Even though Gaddis remained interested in purchasing the property (and more than one year later did so), and he and the defendant discussed the status of the broker, there is no satisfactory proof that the broker had a listing agreement with the defendant.

The fact that Gaddis eventually purchased property is not dispositive of the issue.  The plaintiff must show that the property was listed with him, or, failing that, that the defendant agreed to pay him a commission in some amount.  There is no proof of this, much less clear and convincing proof.

The appellees rely on *Pacesetter Properties v. Hardaway,* 635 S.W.2d 382 (Tenn. Ct. App. 1981) as authority for their argument that they did not engage in bad faith in renewing negotiations with Gaddis.

In *Hardaway,* the owner allowed a broker to attempt to find a tenant.  The broker introduced a prospective tenant, Stein, to the owner who began negotiations with him.  Thereafter, the broker notified the owner that Stein refused a ten-year term and considered the rent excessive.

Stein lost interest in the property and began a search in other cities for appropriate space.  He was unsuccessful and reapproached the owner who, six months later, contracted with Stein to the exclusion of the broker.  One of the issues was whether the owner interrupted the negotiations conducted by the broker with the intent to delay the sale so as to avoid payment of a commission.  We held that there was a sufficient break-off of negotiations and sufficient lapse of time before renewal of negotiations to prevent the initial effort of the broker from being the procuring cause of the lease, and that there was no evidence of fraud.

We recognize the salutary principle that sharp practice must not be allowed to defeat the commission of a broker who has brought a seller-buyer together pursuant to contract.[2]  *See, Robinson v. Kemmons Wilson Realty Co.,* 293 S.W.2d 754 (Tenn. Ct. App. 1956); *Thomas v. Million,* 250 S.W.2d 111 (Tenn. Ct. App. 1952).

But the broker failed to prove a contract, and we think *Pacesetter* controls.

_____

[2]An oral listing contract is recognized in Tennessee, but must be proved by clear and convincing evidence.  *Parks v. Morris,* 914 S.W.2d 545 (Tenn. Ct. App. 1995).

The judgment is therefore affirmed at the costs of the appellant.

_____
William H. Inman, Senior Judge

CONCUR:

_____
Herschel P. Franks, Judge

_____
Don T. McMurray, Judge